## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

VICTOR APODACA,

       Plaintiff,

vs.                                                                No. CIV 13-0113 JB/SMV

STATE OF NEW MEXICO
ADULT PROBATION AND PAROLE,
WESLEY HATLEY AND SUSAN
PAUTLER, et al., IN THEIR
INDIVIDUAL AND OFFICIAL CAPACITY,
CURRY COUNTY DETENTION CENTER,
WARDEN GERRY BILLY, CAPT. SANDOVAL,
CAPT. LUCERO, DOCTOR TIMOTHY HILLIS
AND NURSE NANCY LUERAS, et al. IN
THEIR INDIVIDUAL AND OFFICIAL CAPACITY,
NMSPD, NEW MEXICO STATE POLICE,
NEW MEXICO ADULT PROBATION AND
PAROLE, NMAPP,

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court, under 28 U.S.C. § 1915(e)(2) and rule 12(b)(6)

of the Federal Rules of Civil Procedure, on: (i) the Complaint, filed February 4, 2013 (Doc. 1);

(ii) the Civil Rights Complaint, filed February 8, 2013 (Doc. 3); and (iii) the Prisoner's Civil

Rights Complaint, filed May 13, 2013 (Doc. 9)(together the "Complaint"). Plaintiff Victor

Apodaca is incarcerated, appears pro se, and filed an Application to Proceed in District Court

Without Prepaying Fees or Costs on June 24, 2013 (Doc. 13). The filing fee for this civil rights

Complaint is $350.00. Under § 1915(b)(1) and (2), Apodaca must pay the full amount of the

filing fee in installments. Based on the information in Apodaca's filings, the Court will grant him

leave to proceed *in forma pauperis* and will waive the initial partial payment pursuant to

§ 1915(b)(1).  Also before the Court are Apodaca's Second Motion for Extension of Time, filed

May 13, 2013 (Doc. 8)("Motion for Extension of Time"), Motion for Jury Demand, filed June 24,

2013 (Doc. 11), and Motion for Jury Demand, filed July 5, 2013 (Doc. 16)(together "Motion for

Jury Demand").   The Court will deny the Motion for Extension of Time as moot, and will

construe the Motion for Jury Demand as Apodaca's jury demand, pursuant to rule 38 of the

Federal Rules of Civil Procedure.   The Court will also dismiss certain of Apodaca's claims.

The Court has the discretion to dismiss an in forma pauperis complaint *sua sponte* under

§ 1915(e)(2) "at any time if the action . . . is frivolous or malicious; [or] fails to state a claim upon

which relief may be granted."   The Court also may dismiss a complaint *sua sponte* under rule

12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim if "it is 'patently

obvious' that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity

to amend his complaint would be futile."   Hall v. Bellmon, 935 F.2d 1106, 1109 (10th Cir.

1991)(quoting McKinney v. Oklahoma Dep't of Human Services, 925 F.2d 363, 365 (10th Cir.

1991)).   A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).   In reviewing Apodaca's pro se

Complaint, the Court applies the same legal standards applicable to pleadings that counsel drafts,

but liberally construes the allegations.   See Northington v. Jackson, 973 F.2d 1518, 1520-21 (10th

Cir. 1992).

The original Complaint alleges that Defendants Wesley Hatley and Susan Pautler

conducted a home visit as part of Apodaca's probation.   Apodaca was not the owner of the

residence where he was staying.   Without gaining the owner's permission, Hatley and Pautler

entered the residence.   Hatley then arrested Apodaca and injured him by use of excessive force.

In his First Supplemental Complaint, Apodaca names additional Defendants who allegedly denied

him necessary medical treatment during his subsequent confinement at the Curry County Detention Center ("CCDC") in Clovis, New Mexico.   CCDC staff sent him to a medical facility for further examination of his injuries.   Staff at the medical facility informed CCDC staff that Apodaca required surgery.   The Defendants have not provided the surgery.   In his Second Supplemental Complaint, Apodaca alleges a second incident of illegal search and seizure, but does not identify a responsible party.   He asserts his claims under the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States of America,[1] for which he seeks damages and injunctive relief.

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment to the Constitution of the United States of America protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const. amend. IV.   It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."   U.S. Const. amend. IV.   In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."

---

[1] In his claims of illegal search and seizure, Apodaca also invokes the Eighth and Fourteenth Amendments.   See Complaint at 1; Prisoner's Civil Rights Complaint at 2.   Because allegations of excessive force during a search or seizure implicate the reasonableness standard of the Fourth Amendment, see Porro v. Barnes, 624 F.3d 1322, 1325 (10th Cir. 2010)("So, because the Fourth Amendment protects against *unreasonable* searches and seizures and pertains to the events leading up to and including an arrest of a citizen previously at liberty, excessive force claims arising during this period are generally reviewed under a relatively exacting objective reasonableness standard." (emphasis in original)(internal quotation marks omitted)), the Court will dismiss these Eighth and Fourteenth Amendment claims, see Porro v. Barnes, 624 F.3d at 1325-26 (analyzing the plaintiff's § 1983 suit under only the specific constitutional provision implicated, in that case the Fourteenth Amendment, when the plaintiff alleged excessive force under the Fourth, Eighth, and Fourteenth Amendments).

United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.   The hallmark of the Fourth Amendment is reasonableness."   United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).   See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).   "In the criminal context, reasonableness usually requires a showing of probable cause."   Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)).   The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."   Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

      1.     ***United States v. Jones***.

The defendant in United States v. Jones was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a Global Positioning System device to the defendant's car.   See 132 S. Ct. at 948.   On the eleventh day, task force agents attached the GPS device to the bottom of the defendant's car while the car was in Maryland.   The agents then used the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device.   See 132 S. Ct. at 948.

The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined, held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"   132 S. Ct. at 949.   Justice Scalia reasoned that the plaintiff United States of America's conduct was a Fourth Amendment search, because the government trespassed on a constitutionally protected area.   See 132 S. Ct. at 949 ("The Fourth Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'   It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment.").   Such a physical intrusion, Justice Scalia opined, would have come within the Framers' intended definition of a "search": "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information.   We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."   132 S. Ct. at 949. Justice Scalia reconciled the Supreme Court's conclusion that attaching a GPS device to track a jeep in plain view was a Fourth Amendment search with New York v. Class, 475 U.S. 106 (1986), in which the Supreme Court concluded that a visual examination of the outside of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we suggested that this [physical invasion] would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search."   132 S. Ct. at 952.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property law based approach to determine whether there is a search, but did not shy away from the fact that, in recent history, the Supreme Court had deviated from this approach:

The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.

Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. Kyllo v. United States, 533 U.S. [at] 31 . . . . Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [Katz v. United States], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

132 S. Ct. at 949-50.

The United States had contended that, under the "Harlan standard" -- i.e., the Katz v. United States reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the jeep on the public roads, which were visible to all." 132 S. Ct. at 950. Justice Scalia concluded, however, that the Supreme Court "need not address the Government's contentions" in relation to the Katz v. United States reasonable-expectation-of-privacy test analysis, because the trespass-based search approach, which existed at the time of the Fourth Amendment's adoption, disposed of the issue:

Jones's Fourth Amendment rights do not rise or fall with the Katz formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." Kyllo[ v. United States, 533 U.S. at 34]. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. Katz did not repudiate that understanding. Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between other people obtained by warrantless placement of electronic surveillance devices in their homes. The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded." Alderman v. United States, 394 U.S. 165, 176 . . . (1969). "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private

- 6 -

conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ."  Id., at 180.

132 S. Ct. at 950-51 (some alteration in original)(footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the majority's opinion reflects an irreducible constitutional minimum: When the Government physically invades personal property to gather information, a search occurs.   The reaffirmation of that principle suffices to decide this case."   132 S. Ct. at 955 (Sotomayor, J., concurring).   She continued:

> Of course, the Fourth Amendment is not concerned only with trespassory intrusions on property.  See, e.g., Kyllo v. United States, 533 U.S. [at] 31-33 . . . .  Rather, even in the absence of a trespass, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." Id., at 33; see also Smith v. Maryland, 442 U.S. 735, 740-741 . . . (1979); Katz v. United States, 389 U.S. [at] 361 . . . (Harlan, J., concurring).

132 S. Ct. at 954-55 (Sotomayor, J., concurring).   Justice Sotomayor's concurrence focused on the reality, in her view, that,

> physical intrusion is now unnecessary to many forms of surveillance. . . .   In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance. But "[s]ituations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."

132 S. Ct. at 955 (Sotomayor, J., concurring)(alteration in original)(quoting the majority opinion, 132 S. Ct. at 953).

The Honorable Samuel A. Alito, Associate Justice, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment only, reasoning that, although he agreed with the result, given the use of twenty-first century technology, he would have analyzed whether the government's long-term monitoring of the defendant violated the Katz v. United States

reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of unreasonable searches and seizures to a 21st-century surveillance technique, the use of a Global Positioning System (GPS) device to monitor a vehicle's movements for an extended period of time.   Ironically, the Court has chosen to decide this case based on 18th-century tort law.   By attaching a small GPS device to the underside of the vehicle that respondent drove, the law enforcement officers in this case engaged in conduct that might have provided grounds in 1791 for a suit for trespass to chattels.   And for this reason, the Court concludes, the installation and use of the GPS device constituted a search.   [132 S. Ct.] at 948-949.

> This holding, in my judgment, is unwise.   It strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law; and it is highly artificial.

> I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

132 S. Ct. at 957-58 (Alito, J., concurring in the judgment).   Justice Alito first took issue with what he called the majority's "questionable proposition that the[] two procedures [of attaching and using a GPS device] cannot be separated for Fourth amendment purposes."   132 S. Ct. at 958. Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search."   132 S. Ct. at 958.

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence," but disagreed with the majority, stating: "[W]e know this is incorrect."   132 S. Ct at 958.   Justice Alito pointed out that the open-fields doctrine grew out of the distinction between a physical intrusion of any private property and property that is part of a home: "At common law, any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment."   132 S. Ct. at

958-959 (Alito, J., concurring in the judgment)(quoting Oliver v. United States, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority used was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with cases involving wiretapping and eavesdropping surveillance.   United States v. Jones, 132 S. Ct. at 959, 960 (Alito, J., concurring in the judgment).   Justice Alito contended that "the majority is hard pressed to find support in post-Katz cases for its trespass-based" decision that, when the government attached the GPS device to Jones' Jeep, it trespassed on his effects and performed a Fourth Amendment search.   132 S. Ct. at 960-61.   Justice Alito pointed to multiple problems that he believes the majority's trespass-based approach creates.   First, he asserted that the majority's analysis is irreconcilable with the element of the government's conduct that he contends society would find offensive -- the GPS-monitoring and not the attachment of the device.   If the government could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.   See 132 S. Ct. at 961.   Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."   132 S. Ct. at 961.   Justice Alito also asserted that, by tying Fourth Amendment searches to property law and trespass concepts, the Fourth Amendment's protections "may vary from State to State," based on different property and contract laws in the various states. 132 S. Ct. at 961-62.

2.     *Florida v. Jardines*.

In <u>Florida v. Jardines</u>, 133 S. Ct. 1409 (2013), Justice Scalia, writing for the majority once again, held that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search.   133 S. Ct. at 1417-18.   Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in <u>Florida v. Jardines</u>. Justice Kagan filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full."   133 S. Ct. at 1420 (Kagan, J., concurring).   Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In <u>Florida v. Jardines</u>, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade, Florida, police department and the Drug Enforcement Administration sent a surveillance team to Jardines' home.   <u>See</u> 133 S. Ct. at 1413.   Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes.   <u>See</u> 133 S. Ct. at 1413.   As the dog approached Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point."   133 S. Ct. at 1413.   The dog's handler then immediately left the porch, and told the other agents and officers at the scene that there had been a positive alert for drugs, at which time the officers applied for and received a search warrant for the residence, the execution of which revealed marijuana plants.   <u>See</u> 133 S. Ct. at 1413.   Jardines was arrested for trafficking in marijuana and moved to suppress the evidence based on an illegal search.   <u>See</u> 133

- 10 -

S. Ct. at 1413.

Justice Scalia held that the use of a drug-sniffing dog was a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

133 S. Ct. at 1414.  Justice Scalia noted that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 176).   Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text."   133 S. Ct. at 1414.

Justice Scalia held that "the officers' investigation took place in a constitutionally protected area," the home, as the front porch is the home's curtilage.   See 133 S. Ct. at 1414-15. Justice Scalia then "turn[ed] to the question of whether it was accomplished through an unlicensed physical intrusion," 133 S. Ct. at 1415, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas.   In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner."  Id. Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."  2 Wils. K.B.,

at 291.   As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.   He had not.

133 S. Ct. at 1415.   Justice Scalia noted that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he concluded that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that."   133 S. Ct. at 1415-16 (emphasis in original).   Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker.   To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police.   The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose.   Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics.   Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

133 S. Ct. at 1416.

The State of Florida argued "that investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest."   133 S. Ct. at 1417.   The State of Florida cited to United States v. Place, 462 U.S. 696 (1983), United States v. Jacobsen, 466 U.S. 109 (1984), and Illinois v. Caballes, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and canine inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable expectation of privacy' described in Katz."   133 S. Ct. at 1417.   Justice Scalia pointed out that, in

- 12 -

United States v. Jones, the Supreme Court had already concluded that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under Katz v. United States] when the government gains evidence by physically intruding on constitutionally protected areas."   133 S. Ct. at 1417 (quoting United States v. Jones, 132 S. Ct. at 951-52). Because the Supreme Court had already concluded that the conduct was a Fourth Amendment search under the trespass-based analysis, therefore, it held that it was unnecessary to consider whether the conduct amounts to a search under the Katz v. United States reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz.   One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy.   That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

133 S. Ct. at 1417.

The Honorable Elena Kagan, Associate Justice, wrote a concurring opinion, noting: "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests."   133 S. Ct. at 1418 (Kagan, J., concurring).   Justice Kagan analogized the government's conduct in using a drug sniffing dog on Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but instead, peers through the windows "into your home's furthest corners" with "super-high-powered binoculars," and "in just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one."   133 S. Ct. at 1418 (Kagan, J., concurring).   This conduct, she posited, is a trespass which exceeds any implied license and is also an invasion of reasonable expectations of privacy; she argued that, like her analogy, the facts in Florida v. Jardines likewise

involved a trespass and a violation of privacy expectations:

> That case is this case in every way that matters.  Here, police officers came to
> Joelis Jardines' door with a super-sensitive instrument, which they deployed to
> detect things inside that they could not perceive unassisted.  The equipment they
> used was animal, not mineral.  But contra the dissent, see [133 S. Ct.] at 1420
> (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is
> of no significance in determining whether a search occurred.

133 S. Ct. at 1418 (Kagan, J., concurring).  According to Justice Kagan, had she written the

majority opinion based on the Katz v. United States reasonable-expectations-of-privacy search

test,

> [a] decision along those lines would have looked . . . well, much like this one.  It
> would have talked about "'the right of a man to retreat into his own home and there
> be free from unreasonable governmental intrusion.'"   [133 S. Ct.] at 1414 (quoting
> Silverman v. United States, 365 U.S. 505, 511 . . . (1961)).  It would have insisted
> on maintaining the "practical value" of that right by preventing police officers from
> standing in an adjacent space and "trawl[ing] for evidence with impunity."  [133 S.
> Ct.] at 1414.  It would have explained that "'privacy expectations are most
> heightened'" in the home and the surrounding area.  [133 S. Ct.] at 1414-15
> (quoting California v. Ciraolo, 476 U.S. [at] 213 . . . ).  And it would have
> determined that police officers invade those shared expectations when they use
> trained canine assistants to reveal within the confines of a home what they could
> not otherwise have found there.  See [133 S. Ct.] at 1415-16, and n. 2-3.

133 S. Ct. 1409, 1418-19 (Kagan, J., concurring).

Justice Alito's dissenting opinion, in which Chief Justice Roberts, and Justices Kennedy

and Breyer, joined, submitted that "[t]he Court's decision in this important Fourth Amendment

case is based on a putative rule of trespass law that is nowhere to be found in the annals of

Anglo-American jurisprudence."   133 S. Ct. at 1420 (Alito, J., dissenting).  Justice Alito noted

that general trespass law permits a license to public members to use a walkway to approach a

house's door, including strangers such as mailmen and solicitors, and the majority's conclusion

that "the police officer in this case, Detective Bartelt, committed a trespass because he was

accompanied during his otherwise lawful visit to the front door of respondent's house by his dog,

- 14 -

Franky," is without a sound basis in trespass law.   133 S. Ct. at 1420-21 (Alito, J., dissenting).

Justice Alito also asserted that decision is inconsistent with the Katz v. United States'

reasonable-expectations-of-privacy test: "A reasonable person understands that odors emanating

from a house may be detected from locations that are open to the public, and a reasonable person

will not count on the strength of those odors remaining within the range that, while detectible by a

dog, cannot be smelled by a human."   Florida v. Jardines, 133 S. Ct. at 1421 (Alito, J., dissenting).

Justice Alito contended that the majority's opinion that the detective "exceeded the

boundaries of the license to approach the house that is recognized by the law of trespass, . . . is

unfounded."   133 S. Ct. at 1421 (Alito, J., dissenting).   Justice Alito pointed out that the law of

trespass does not distinguish between visitors or reasons for the visit in granting an implied license

to approach a house's front door.   See 133 S. Ct. at 1421-22 (Alito, J., dissenting).   He also

asserted: "As I understand the law of trespass and the scope of the implied license, a visitor who

adheres to these limitations is not necessarily required to ring the doorbell, knock on the door, or

attempt to speak with an occupant," and uses mail carriers as an example of such a visitor.   133 S.

Ct. at 1423 (Alito, J., dissenting).   Justice Alito pointed out that the implied license also applies to

law enforcement and cites to Kentucky v. King, 131 S. Ct. 1849 (2011), in which the Supreme

Court held that law enforcement officers approaching the front door of a residence to conduct a

"knock and talk" is not a Fourth Amendment search.   Florida v. Jardines, 133 S. Ct. at 1423

(Alito, J., concurring).   Given that "Detective Bartelt did not exceed the scope of the license to

approach respondent's front door," Justice Alito took issue with the majority's conclusion "that

Detective Bartelt went too far because he had the 'objectiv[e] . . . purpose to conduct a search.'"

133 S. Ct. at 1423 (Alito, J., dissenting)(emphasis in original).   According to Justice Alito,

because approaching a house to conduct a knock and talk is not a search,

- 15 -

[w]hat the Court must fall back on, then, is the particular instrument that Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the entire body of common-law decisions, the Court has not found a single case holding that a visitor to the front door of a home commits a trespass if the visitor is accompanied by a dog on a leash.   On the contrary, the common law allowed even unleashed dogs to wander on private property without committing a trespass.

The Court responds that "[i]t is not the dog that is the problem, but the behavior that here involved use of the dog."   But where is the support in the law of trespass for <u>this</u> proposition? Dogs' keen sense of smell has been used in law enforcement for centuries. The antiquity of this practice is evidenced by a Scottish law from 1318 that made it a crime to "disturb a tracking dog or the men coming with it for pursuing thieves or seizing malefactors."   If bringing a tracking dog to the front door of a home constituted a trespass, one would expect at least one case to have arisen during the past 800 years.   But the Court has found none.

133 S. Ct. at 1424 (Alito, J., dissenting)(emphasis in original)(internal citations omitted).   Justice Alito thus concluded: "For these reasons, the real law of trespass provides no support for the Court's holding today.   While the Court claims that its reasoning has 'ancient and durable roots,' its trespass rule is really a newly struck counterfeit."   133 S. Ct. at 1424 (Alito, J., dissenting)(internal citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

[W]e have already rejected a very similar, if not identical argument, <u>see</u> <u>Illinois v.</u> <u>Caballes</u>, . . . and in any event I see no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand.

133 S. Ct. at 1424 (Alito, J., dissenting).   Justice Kagan asserted that Bartelt's use of Franky the drug-sniffing dog was an invasion of Jardines' privacy in his home, because the government's conduct was similar to the conduct in <u>Kyllo v. United States</u>, in which the Supreme Court held that using a thermal imaging device to monitor movements in a home was a Fourth Amendment search. Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the use of a

drug-sniffing dog is the same as the use of a thermal imaging device.   The very argument now advanced by the concurrence appears in Justice Souter's <u>Caballes</u> dissent.   But the Court was not persuaded."   133 S. Ct. at 1425 (Alito, J., dissenting)(internal citations omitted)(citing <u>Illinois v. Caballes</u>, 543 U.S. at 409-10 and 413 n.3).   Justice Alito contended that "<u>Kyllo</u> is best understood as a decision about the use of new technology. . . .   A dog, however, is not a new form of 'technology' or a 'device.'   And, as noted, the use of dogs' acute sense of smell in law enforcement dates back many centuries."   133 S. Ct. at 1425 (Alito, J., dissenting).   Justice Alito therefore concluded that the government's conduct in <u>Florida v. Jardines</u> "did not constitute a trespass and did not violate respondent's reasonable expectations of privacy.   I would hold that this conduct was not a search, and I therefore respectfully dissent." 133 S. Ct. at 1426.

### 3.   <u>Standing</u>.

The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing."   <u>E.g.</u>, <u>United States v. Creighton</u>, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); <u>United States v. Poe</u>, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing <u>United States v. Rubio-Rivera</u>, 917 F.2d 1271, 1274 (10th Cir. 1990)); <u>United States v. Shareef</u>, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.").   Accordingly, the Court, tracing the Tenth Circuit's language has also referred to this test as one of standing.   <u>See</u>, <u>e.g.</u>, <u>United States v. Harmon</u>, 785 F. Supp. 2d at 1157 ("Standing

requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).   The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test has now expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."   439 U.S. at 133.   Dispensing with this label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones' use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant.   However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim.   We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine.   Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.   The inquiry under either approach is the same.   But we think

the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.  The Court in Jones also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks.  362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39.  The Supreme Court emphasized:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . .  But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40.   In Minnesota v. Carter, the Supreme Court recognized that Rakas v. Illinois put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth Amendment search analysis:

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . .  Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."  Id., at 140 . . . .

525 U.S. at 87-88.  The Supreme Court has thus noted that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that Katz v. United States' reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth Amendment test, as opposed to a standing test.   Rakas v. Illinois, 439 U.S. at 139.

> Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth

- 19 -

Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

Rakas v. Illinois, 439 U.S. at 139 (footnote omitted).  This development is in line with the Supreme Court's guidance that the analysis "is more properly subsumed under substantive Fourth Amendment doctrine."   Rakas v. Illinois, 439 U.S. at 139.

### 4.   Whether a Fourth Amendment Search Occurred.

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information.  See United States v. Jones, 132 S. Ct. at 947.   "[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test."   United States v. Jones, 132 S. Ct. at 947 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).   "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"   Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).

### a.   Trespass-Based Analysis.

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"   Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by physically

- 20 -

intruding on a constitutionally protected area.")).   "[A]n actual trespass," however, "is neither

necessary nor sufficient to establish a constitutional violation."   United States v. Jones, 132 S. Ct.

at 951 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]resspass alone does not qualify, but there

must be conjoined with that . . . an attempt to find something or to obtain information."   United

States v. Jones, 132 S. Ct. at 951 n.5.   The Supreme Court has also noted that "[p]hysically

invasive inspection is simply more intrusive than purely visual inspection."   Bond v. United

States, 529 U.S. 334, 337 (2000).   Moreover, the Supreme Court in Florida v. Jardines suggested

that the trespass-based analysis applies only when the trespass occurs in one of the four places or

things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .   But when it comes to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414.

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), the Court

analyzed whether the Secret Service's digital scan of electronic information contained in the

defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a

trespass-based analysis, concluding that it was not, because the Secret Service properly possessed

the credit and debit cards, and the additional act of scanning the cards to read the virtual data

contained on the strips did not involve a physical intrusion or physical penetration of space.   See

943 F. Supp. 2d at 1264-65.   The Court noted that, "[e]ven if the Supreme Court were to extend

the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret

Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area.   943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip.  Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in their persons, houses, papers, and effects . . . ."  U.S. Const. amend IV.

943 F. Supp. 2d at 1273 (alteration in original).

> ### b.    *Katz v. United States*' Reasonable-Expectations-of-Privacy Search Test Remains Good Law.

The Court has noted that, in light of the Supreme Court's recent decisions in Florida v. Jardines and United States v. Jones, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law."  United States v. Alabi, 943 F. Supp. 2d 1201 (D.N..M. 2013)(Browning, J.)(citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).   Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the Katz test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in Katz . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" bear an uncanny resemblance to those expectations of privacy that this Court

- 22 -

considers reasonable.  When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has <u>occurred</u> (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment.  That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'"  Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the <u>Constitution</u> would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).[2]  In both <u>United States v. Jones</u> and <u>Florida v. Jardines</u>, however, Justice Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis. Rather, his majority opinions asserted that the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis added to the trespass-based analysis.  <u>See Florida v. Jardines</u>, 133 S. Ct. at 1417 ("The <u>Katz</u> reasonable-expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based understanding of the Fourth Amendment." (emphasis in original))(quoting <u>United States v. Jones</u>, 132 S. Ct. at 952).  The Court concluded in <u>United States v. Alabi</u> that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the <u>Katz v. United States</u> reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach."   2013 WL 1876791, at *35.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in <u>Maryland v. King</u>, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of

_____

[2] The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join Justice Scalia's <u>Minnesota v. Carter</u> concurrence.

arrestees is a reasonable search that can be considered part of a routine booking procedure," 133 S.

Ct. at 1980.   Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking

an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never

held that merely taking a person's photograph invades any recognized 'expectation of privacy.'"

Maryland v. King, 133 S. Ct. at 1986 (Scalia, J., dissenting).   Justice Scalia also pointed out that a

person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the body is at stake?   (The Fourth Amendment lists "persons" first among the entities protected against unreasonable searches and seizures.)

Maryland v. King, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original).   Justice Scalia

also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school.   Perhaps the construction of such a genetic panopticon is wise.   But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 133 S. Ct. at 1989 (Scalia J., dissenting).   The Court therefore concludes that

Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when

determining whether a search is reasonable for Fourth Amendment purposes, although Justice

Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

     **c.**     ***Katz v. United States*' Reasonable-Expectations-of-Privacy Analysis.**

"'Fourth Amendment rights are personal rights which, like some other constitutional

rights, may not be vicariously asserted.'"   Rakas v. Illinois, 439 U.S. at 133-34 (quoting

- 24 -

Alderman v. United States, 394 U.S. at 174).   "A district court cannot suppress evidence unless the movant proves that a search implicates personal Fourth Amendment interests."   United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).   "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'"   United States v. Miller, 425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).[3]   The Tenth Circuit

---

[3]   The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"   Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz. V. United States, 389 U.S. at 351).   In support for this proposition, the Court relied on the majority's decision in Katz v. United States, where the Supreme Court stated that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.   The petitioner has strenuously argued that the booth was a "constitutionally protected area."   The Government has maintained with equal vigor that it was not.   But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case.   For the Fourth Amendment protects people, not places.   What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.   See Lewis v. United States, 385 U.S. 206, 210 [1966]; United States v. Lee, 274 U.S. 559, 563 . . . (1927).   But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.   See Rios v. United States, 364 U.S. 253 . . . [1960]; Ex parte Jackson, 96 U.S. 727, 733 . . . [1877].

Katz v. United States, 389 U.S. at 351-52.   The Supreme Court appears to have changed course in its two most recent opinions on Fourth Amendment searches.   In Florida v. Jardines, the particular place at which the search occurred weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . . protections 'when the Government does engage in a physical intrusion of a constitutionally protected area.'"   133 S. Ct. at 1414 (original alterations and original emphasis omitted)(emphasis added)(quoting United States v. Knotts, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)).   See United States v. Jones,

has thus noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched." United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)). Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court has thus recognized that, rather than determining whether law enforcement conduct was a search, it sometimes proves easier to "assess[] when a search is not a search." Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States. Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth. As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

---

132 S. Ct. at 951 ("Katz did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. . . . Katz did not narrow the Fourth Amendment's scope.'" (emphasis added)). The Court thus concludes that, while it may be true that the analysis does not turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area,'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

- 26 -

Kyllo v. United States, 533 U.S. at 32-33.   The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed., 2004) --  which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"   United States v. Jones, 132 S. Ct. at 951.  See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").   In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control."   Rakas v. Illinois, 439 U.S. at 143 & n.12.   While ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession."   United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

i.      **Subjective Expectation of Privacy.**

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'"   Bond v. United States, 529 U.S. at 338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).   Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party. "[T]he Fourth Amendment protects people, not places.   What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."   Katz v. United States, 389 U.S. at 351.   The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect. In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.   For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.   Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.   In determining whether a "legitimate

expectation of privacy" existed in such cases, a normative inquiry would be proper.

442 U.S. at 740 n.5.   Most recently, in <u>Jones v. United States</u>, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.   This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.   People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.[4]   Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not.   I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy.   I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).   Regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think what they post on the internet is or remains private.   <u>See</u> United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley, J.)(holding that a person posting to his Facebook profile had "no justifiable expectation that his 'friends' would keep his profile private").

---

[4] URL is the abbreviation for a "uniform resource locator, . . . also known as web address, [which] is a specific character string that constitutes a reference to a[n internet] resource." <u>Uniform Resource Locator</u>, Wikipedia.org, http://en.wikipedia.org/wiki/ Uniform_resource_locator (last visited Apr. 23, 2013).

### ii.       Privacy Expectation that Society is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." United States v. Ruiz, 664 F.3d at 838 (United States v. Allen, 235 F.3d at 489). The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." United States v. Jacobsen, 466 U.S. 109, 122 (1984). Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects. See California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting Oliver v. United States, 466 U.S. at 181-83). This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'" LaFave, supra, §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353). Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate. The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes

a privacy interest as reasonable is determined based on our societal understanding regarding what

deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the
> Fourth Amendment that a place should be free of government intrusion not
> authorized by warrant.  In assessing the degree to which a search infringes upon
> individual privacy, the Court has given weight to such factors as the intention of the
> Framers of the Fourth Amendment, the uses to which the individual has put a
> location, and our societal understanding that certain areas deserve the most
> scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any

legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v.

Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States

v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute

a 'search' within the meaning of the Fourth Amendment." United States v. Place, 462 U.S. at

707.  The case arose when law enforcement seized the luggage of an airline passenger and

transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699.

The drug sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a

search warrant, and, upon opening the bags, the officers found over one-thousand grams of

cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable expectation of

privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was

not a Fourth Amendment search and emphasized the unique nature of the investigative technique,

which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of
> personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by
> a well-trained narcotics detection dog, however, does not require opening the
> luggage. It does not expose noncontraband items that otherwise would remain
> hidden from public view, as does, for example, an officer's rummaging through the

contents of the luggage.  Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item.  Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis*.  We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.  Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine.  See 466 U.S. at 122-24.  A Federal Express employee and supervisor had opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder.  See 466 U.S. at 111.  They then called the DEA and repacked the contents in the original packaging before they provided the package to the DEA officers.  See 466 U.S. at 111.  When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine.  See 466 U.S. at 111-12.  The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search.   It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

- 32 -

466 U.S. at 120 (footnote omitted).   The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment."   United States v. Jacobsen, 466 U.S. at 122.   The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine.   It could tell him nothing more, not even whether the substance was sugar or talcum powder.   We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.   This conclusion is not dependent on the result of any particular test.   It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.   But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.   Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.
>
> . . . .
>
> Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

- 33 -

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement."   Illinois v. Caballes, 543 U.S. at 409.[5]   The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the line of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at], governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests.'"   543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).   The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable,'"   543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122).   The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search.   Kyllo v. United States, 533 U.S. 27 . . . .   Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath."   Id., at 38 . . . .   The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car.   A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

_____

[5] The Honorable John Paul Stevens, former Associate Justice for the Supreme Court, penned the majority's opinion in Illinois v. Caballes.   Out of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.   See 543 U.S. at 405.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants."   943 F. Supp. 2d at 1275.   The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable."   943 F. Supp. 2d at 1280.   The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ."   943 F. Supp. 2d at 1281.   Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals."   943 F. Supp. 2d at 1287.

**5.      Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.   Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).   See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our

general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."   United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)).   The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"   Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"   Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).   See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'").

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."   At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the

Tenth Circuit look to the individual's privacy expectations.  See, e.g., United States v. Knights,

534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . .

reasonable expectation of privacy," because a condition of his probation was to consent to search

of his apartment without notice or probable cause, and because he was clearly notified and

informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs,

convicted felons on probation, have a more limited expectation of privacy than the ordinary

citizen, noting: "Those who have never been convicted of a felony are the last distinct category.

What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon,

may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th

Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex

offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search

and seizure.   This is so in light of an inmate's diminished privacy rights . . . .").

As Justice Kagan has noted, property law informs society's expectations about what

government intrusions are reasonable: "It is not surprising that in a case involving a search of a

home, property concepts and privacy concepts should so align.  The law of property 'naturally

enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."   Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).   Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."   515 U.S. at 654 (internal citations omitted).

**6.**   **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.   See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).   When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.   United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).   The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,'" and (ii) "the officers must have used no 'implied or express duress or coercion.'"   United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.   See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

(i) the "threatening presence of several officers;" (ii) the "use of aggressive

language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."   United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).   Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."   United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).   See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.   For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.   See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."   United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).   Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."   United States v. Drayton, 536 U.S. at 205.   As such, "it is only by analyzing all

- 39 -

the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.   It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."   Schneckloth v. Bustamonte, 412 U.S. at 232.

### 7.        Legal Standard for Probable Cause in an Affidavit in Support of a Warrant.

Probable cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).   To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).   "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).   The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)[6](quoting Illinois v.

---

[6] United States v. Reed is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

Gates, 462 U.S.213, 238 (1983)).   See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009). In making his or her determination, the magistrate judge "may draw reasonable inferences from the material provided in the warrant application."   United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause." United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Illinois v. Gates, 462 U.S. at 236, 238-39.  This deference is appropriate to further the Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of office[r]s . . . ."). Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

The deference accorded a magistrate judge's probable cause determination, however, is not boundless.  See United States v. Leon, 468 U.S. 897, 914 (1984).  The Court should not defer to

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Reed has persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause.  See United States v. Danhauer, 229 F.3d at 1006.  Specifically, the Court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

8.     **The Particularity Requirement for Search Warrants**.

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized."  Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)).  The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant.  See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965))).  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  United States v. Janus

Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In Cassady v. Goering, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal.   567 F.3d at 635.   The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes."   567 F.3d at 635 (quoting Voss v. Bergsgaard, 774 F.2d at 405).   The Tenth Circuit explained that it had previously "applied a blanket suppression where officers *conducted a general search for evidence* of crimes not specifically listed in the warrant," 567 F.3d at 643 (emphasis in original)(citing United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996); United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988)); given that line of cases, the Tenth Circuit said "it would be an odd result not to suppress *warrants that expressly authorize* a general search and seizure," 567 F.3d at 643 (emphasis in original).

## ANALYSIS

Apodaca asserts two claims under the Fourth Amendment: one for the officers' entries into residences without warrant or consent, and the other for excessive force during his arrest.   As to the allegedly illegal entries, Apodaca asserts that both incidents occurred in residences that persons other than himself owned.   Several district courts have rejected a parolee's expectations of privacy in another person's residence.   See United States v. Pabon, 603 F. Supp. 2d 406, 417

(N.D.N.Y. 2009)(Kahn, J.)(holding that, where parolee consented to have his residence searched as part of his parole conditions of release, the parolee did not have a privacy interest in the home of a third party); United States v. White, 622 F. Supp. 2d 34, 42-43 (S.D.N.Y. 2008)(holding that the parolee-defendant had a diminished expectation of privacy in the apartment in which he was an overnight guest, because, as part of his conditions of release, he agreed to searches of his residence); United States v. Venson, CR No. 07-364, 2009 WL 1565736, at *7 (W.D. Pa. June 3, 2009)(Diamond, J.)(rejecting the parolee's argument that his Fourth Amendment rights were violated by the warrantless search of another person's home, in which he was occasionally an overnight guest, because the search would have been lawful had it occurred in his residence). United States v. Jones and Florida v. Jardines, however, may require the Court to first address a trespass analysis before making the expectation-of-privacy analysis set forth in Katz v. United States. The Court does not have enough facts to determine whether Apodaca had some property interest on which the police could trespass. For example, the Complaint and record does not reveal whether, as part of probation, he had consented to a search of his residence. A special condition that this Court often enters states:

> The defendant must submit to a search of his person, property, or automobile under his control to be conducted in a reasonable manner and at a reasonable time, for the purpose of detecting firearms, illegal drugs, and any illegal activity at the direction of the probation officer. He must inform any residents that the premises may be subject to a search.

If he gave this consent, he probably cannot assert either trespassing or a violation of his expectation of privacy. On the other hand, absent consent, if he paid rent, the police may not be able to come into his residence without his consent or without a warrant. In any case, under United States v. Jones and Florida v. Jardines, analyzing the reasonableness of the officers' actions will require more evidence than the Court record provides. The Court will order that Defendants

Hatley and Pautler answer Apodaca's Fourth Amendment claims of illegal search and seizure in the original and second supplemental complaints.

In his First Supplemental Complaint, Apodaca asserts a separate Eighth Amendment claim against a number of Defendants.   Specifically, he alleges that Defendants CCDC, Doctor Timothy Hillis, and Nurse Nancy Lueras denied him surgery and orthopedic treatment that staff at the medical facility described as necessary.   Apodaca's allegations support claims under § 1983 only against Hillis and Lueras.   First, a detention center is not a suable entity in a § 1983 action.   See White v. Utah, 5 F. App'x 852, 853 (10th Cir. 2001)("[A] detention facility is not a person or legally created entity capable of being sued.").   Furthermore, Apodaca makes no factual allegations against the other named individuals.   See Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997)("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.").   See also Stidham v. Peace Officer Standards And Training, 265 F.3d 1144, 1157 (10th Cir. 2001)("We hold that the affirmative link described in Rizzo[ v. Goode, 423 U.S. 362, 370-77 (1976),] and its progeny must be alleged in the complaint as well as proven at trial.").   The Court will dismiss Apodaca's Eighth Amendment claims against all Defendants other than Hillis and Lueras.

Because Apodaca has filed his Application to Proceed in District Court Without Prepaying Fees or Costs, his second Motion for Extension of Time is moot.   The Court will construe Apodaca's Motion for Jury Demand as his demand for a jury trial, pursuant to rule 38(b)(1), which requires a party to demand a jury trial by "serving the other parties with a written demand -- which may be included in a pleading -- no later than 14 days after the last pleading directed to the issue is served."   Fed. R. Civ. P. 38(b)(1).   "The 'last pleading directed to such issue' will generally be an answer or a reply, if appropriate, and is determined on a claim by claim basis."   In re Kaiser Steel

- 45 -

Corp., 911 F.2d 380, 388 (10th Cir. 1990).  Because the defendants have not filed an answer, Apodaca's demand for a jury trial is timely.

    **IT IS ORDERED** that (i) the Plaintiff's Application to Proceed in District Court Without Prepaying Fees or Costs, filed June 24, 2013 (Doc. 13), is granted, an initial partial payment is waived, Plaintiff Victor Apodaca must make monthly installment payments of twenty per cent of the preceding month's income credited to his account or show cause why payment should be excused, and the Clerk of the Court is directed to provide Apodaca with two copies of the post-filing financial certificate; (ii) the Plaintiff's Second Motion for Extension of Time, filed May 13, 2013 (Doc. 8), is denied as moot; (iii) the Motion for Jury Demand, filed June 24, 2013 (Doc. 11), and the Motion for Jury Demand, filed July 5, 2013, are construed as Apodaca's demand for a jury trial, pursuant to rule 38 of the Federal Rules of Civil Procedure; (iv) except for claims under the Fourth Amendment to the Constitution of the United States of America of unreasonable search and seizure and under the Eighth Amendment to the Constitution of the United States of America for denial of medical treatment, Apodaca's claims are dismissed; (v) Defendants Curry County Detention Center, Warden Gerry Billy, Captain f/n/u Sandoval, Captain f/n/u Lucero, Lieutenant f/n/u Wagner, Lieutenant f/n/u Boone, Sergeant f/n/u Padilla, New Mexico State Police, and New Mexico Adult Probation and Parole are dismissed as parties to this action; and (vi) the Clerk is directed to issue notice and waiver of service forms, with copies of the Complaint, filed February 4, 2013 (Doc. 1), Civil Rights Complaint, filed February 8, 2013 (Doc. 3), and Prisoner's Civil Rights Complaint, filed May 13, 2013 (Doc. 9), for Defendants Wesley Hatley and Susan Pautler on Apodaca's Fourth Amendment claims of illegal search and seizure, and for Defendants Timothy Hillis and Nancy Lueras on the Eighth Amendment claim of denial of medical treatment.

_____
UNITED STATES DISTRICT JUDGE

*Parties*:

Victor Apodaca
Curry County Adult Detention Center
Clovis, NM

     *Plaintiff pro se*