IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

VICTOR APODACA,

    Plaintiff

v.                                                         No. 13-CV-0113 JB/SMV

DOCTOR TIMOTHY HILLIS
and NURSE NANCY LUERAS, in their
individual and official capacity.

    Defendants.

# REPORT OF *GUARDIAN AD LITEM*
# FOR VICTOR APODACA

COMES NOW the Court-appointed Guardian *Ad Litem*, and for her report regarding settlement of claims raised by Victor Apodaca, states as follows: The *Order Appointing Guardian Ad Litem* indicated that the Guardian ad Litem "shall be appointed as an arm of the court as Guardian ad litem for Plaintiff Victor Apodaca in connection with pending settlement discussions and in connection with [the] Court's consideration of a settlement with the Plaintiff [Doc. 99 ¶10]. For the reasons discussed below, I recommend that the Court approve the proposed settlement in the total amount of **$15,000.00** as being fair, reasonable, and in Victor Apodaca's best interest in his claim that he was denied constitutionally adequate medical care. **[Doc. 1].** I make this recommendation as there are issues related to both liability and causation in this case and also based on Mr. Apodaca's circumstances as discussed herein.

**I.**    **Judicial Authority:**

Whenever a Court is called upon to sanction a compromise of a person who is not otherwise able to protect their own interests, it is proper for the Court to investigate the fairness of the settlement, and determine whether the settlement terms are in the best interests of that

person.  Before approving such an agreement, the Court must ensure that the interest of the child or incompetent person will be adequately considered and protected.  See *Garrick v. Weaver*, 888 F.2d 687, 693 (10th Cir. 1989) ("Rule 17(c) flows from the general duty of the court to protect the interests of infants and incompetents in cases before the court."  *Id. citing Dacanay v. Mendoza*, 573 F.2d 1075, 1079 (9th Cir.1978); *Noe v. True*, 507 F.2d 9, 11-12 (6th Cir.1974).

In accordance with Fed. R. Civ. P. 17(c)(2), "[t]he Court must appoint a guardian ad litem or issue another appropriate order  to protect a minor or incompetent person who is unrepresented in an action."  In fact, under New Mexico law, pursuant to N. M. Stat. Ann. §38-4-16:

> The guardian ad litem so appearing in any action or proceeding for and on behalf of an incapacitated person shall have power to compromise the same and to agree to the judgment to be entered in the action or proceeding for or against the protected person, subject to the approval of the court in which the suit is pending. *Id.*

In *Shelton v. Sloan*, the New Mexico Supreme Court interpreted this statute as requiring court approval when the person who is resolving a case via settlement, is incapacitated. In distinguishing settlements involving minors as opposed to those involving individuals who are declared incompetent, the New Mexico Supreme Court in *Shelton v. Sloan* explained:

> New Mexico, however, has no such statute or rule governing settlements of claims on behalf of minors. There is however, a statute requiring judicial approval of settlements on behalf of incapacitated persons when brought by a Guardian ad Litem, See NMSA 1978, §38-4-16[1]  (2014 Cum. Supl.),  but the statutory definition of "incapacitated person" excludes minors, See NMSA 1978, §38-4-14 (1989). The power of the minor's representative with respect to settlements is therefore left to the common law.  See *Collins v. Tabet*, 111 N.M. 391, 399 n. 5, 806 P.2d 40, 48 n. 5 (1991).
> *Shelton v. Sloan*, 1999-NMCA-048, 127 N.M. 92, 99-100, 977 P.2d 1012, 1019-20.

Therefore, in the exercise of such discretionary, oversight authority, generally the Court's inquiry includes:

---

[1] Pursuant to N.M. Stat. Ann. §27-7-15, "the legislature recognizes that many adults in this state are unable to manage their own affairs or protect themselves from exploitation, abuse, or neglect. Often such adults cannot find others able or willing to render assistance.

1. Whether the terms of settlement were fairly and honestly negotiated;

2. Whether serious questions of law or disputes of fact exist, placing the ultimate outcome of litigation in doubt;

3. Whether the value of an immediate and swift recovery outweighs the mere possibility of greater future relief after protracted and expensive litigation; and

4. Whether the settlement is fair and reasonable, in its effect.
*Ball v. DATS Trucking, Inc.*, Civ. No. 11-94 JB/WPL, ECF. 61 at 4 (D.N.M. filed Dec. 11, 2012) (citing *Jones v. Nuclear Pharm., Inc.*, 741 F.2d 322, 324 (10th Cir. 1984)) (hereinafter the "*Jones* factors"). That is, before approving such an agreement, the Court must ensure that the interest of the child or incompetent person will be adequately considered and protected. *See e.g. Garrick v. Weaver*, 888 F.2d 687, 693 (10th Cir. 1989) (The Court has a general duty to protect the interests of infants and incompetents).

Thus, in an attempt to fulfill that duty and assist the Court with these inquiries, I reviewed the following pleadings and documents:

## II. Investigation:

1. Correspondence exchanged between counsel regarding settlement of this case;
2. Victor Apodaca's medical records from the following providers:
   a. Correctional Healthcare Companies (CHC);
   b. Plains Regional Medical Center (70 pages)
3. Articles regarding Victor Apodaca's arrest;
4. Recording of Conversation Mr. Hart had with Mr. Apodaca on 11/29/17;
5. Selected Pleadings from this case including:
   a. *Complaint for Civil Rights against Wesley Hatley, Susan Pautler, State of New Mexico Adult Probation and Parole*, filed by Victor Apodaca on 02/04/2013 [Doc. 1];
   b. *Supplemental Complaint by Victor Apodaca* on 02/11/2013 [Doc. 3]
   c. *Amended/Supplemental Complaint adding New Mexico State Police Department,* filed by Victor Apodaca on 05/14/2013 [Doc. 9];
   d. *Memorandum Opinion and Order Adopting the Magistrate Judge's Proposed Findings and Recommended Disposition* [Doc. 64];
   e. *Magistrate Judge's Proposed Findings and Recommended Disposition* [Doc 65];
   d. *Clerk's Minutes for Telephonic Status Conference* held before Magistrate Judge Stephan M. Vidmar on 05/10/2017 [Doc 97];

3

  e. *Unopposed Motion to Appoint Guardian Ad Litem Gabrielle M. Valdez* on 08/04/2017 [Doc 98];

  f. *Order by District Judge James O. Browning Granting Motion to Appoint Guardian ad Litem* filed on 08/16/17 [Doc. 99]; and

  g. *Joint Motion to Approve Settlement and Set Fairness Hearing* filed on 02/07/18 [Doc. 100].

In addition to the above, I corresponded and spoke with Victor Apodaca's counsel, F. Michael Hart Esq. I also exchanged emails with Defendants' counsel, Alfred A. Park. Finally, I was able to interview Mr. Apodaca as well as he is incarcerated in the Texas Department Prison System in Hunstiville, Texas facility.

### III. Facts of Claim:

While Plaintiff, Victor Apodaca originally filed three complaints (*See Complaint* [**Doc.1**] filed on February 4, 2013; a Civil Rights Complaint, [**Doc.3**], filed on February 8, 2013, and a Prisoner's Civil Rights Complaint, [**Doc.9**], filed on May 13, 2013), only Plaintiff's claims arising under the Eighth Amendment against Defendants Dr. Timothy Hillis and Nurse Nancy Lueras,[2] remain. **[Doc. 68].** Essentially, Mr. Apodaca asserts that he sustained permanent injuries to his right knee[3] (a torn ACL and a torn medial meniscus posterior horn, as well as effusion and hyperextension contusions), that the Defendants, (jail medical staff) knew about, but yet never properly treated by ensuring that a referral to an orthopedic doctor, was in fact effectuated, and as a result, he is now permanently disabled and he now needs an expensive surgery to fix this knee. **[Doc. 3 at 2]**.

Specifically, Plaintiff argues that he was injured when, during his arrest, Wesley Hutley of Adult Probation and Parole knelt down on Mr. Apodaca's legs and bent his knees back "forcing

---

[2] On February 3, 2014, the Court issued a Memorandum Opinion and Order dismissing all of Plaintiff's claims except those arising under the Fourth Amendment against Defendants Hatley and Pautler, and those claims arising under the Eighth Amendment against Defendants Hillis and Lueras [**Doc. 22**]. On April 6, 2015, the Court dismissed all of Plaintiff's claims against Defendants Hatley and Pautler [**Doc.65**].

[3] Mr. Apodaca indicates that Wesley Hutley of Adult Probation and Parole, "used excessive force by kneeling down on [Mr. Apodaca's] legs and bent his knees forcing his ankles to his buttocks" and as a result, "completely tore [Mr. Apodaca's] ACL. **[Doc. 1].** This claim for excessive force has been dismissed.

4

his ankles to his buttocks" and as a result, completely tore his ACL. **[Doc. 1].** However, Defendants contend that Mr. Apodaca admitted that he was injured during his arrest for a parole violation while attempting to flee the police, Mr. Apodaca fell from a fence and injured his knee. **[Doc. 66 at 5.]** Then, later that night while seated at a table at the detention center, he allegedly began banging his knees up on the table as hard as he could. *Id.*

The Defendants argue that Mr. Apodaca treatment at Curry County Detention Center was appropriate and the facts does not support a claim under the Eighth Amendment that Defendants were deliberately indifferent to Plaintiff's serious medical needs and accordingly there is no basis for Plaintiff's Eighth and Fourteenth Amendment violations. [Doc. 66]. In support, Defendants argue that the day after he was incarcerated, on September 8, 2012, Defendant Hillis ordered x-rays be taken of Mr. Apodaca's right knee at Plains Regional Medical Center ("PRMC"). On September 11, 2012, Nurse Summer Southern examined Mr. Apodaca and noted his swelling and bruising on the outside of his knee. On September 14, 2012, Defendant, Dr. Hillis referred Mr. Apodaca for an MRI. The MRI dated September 24, 2012 showed a completely torn anterior cruciate ligament ACL, a complete tear of the medial medial meniscus posterior horn (effusion and hyperextension contusions as well) to Mr. Apodaca's right knee. On September 27, 2012, Defendant Dr. Hillis referred Plaintiff to an orthopedist for possible surgery. **[Doc. 68 at** 2] (Consult/ Referral to orthopedics for possible surgery of R [right] knee."). Dr. Hillis' note is also signed by Defendant Lueras. *Id.*; **[Doc. 68 at 3]**. On October 5, 2012, Dr. Hillis ordered Lortab 5/325mg. On October 13, 2012, Dr. Hillis ordered Ibuprofen. On October 12, 2012, Raymond Herr, Chief Medical officer apparently gave authorization for an orthopedics consult if Mr. Apodaca was to be at the facility more than 90 days. On October 16, 2012, Dr. Hillis ordered an elastic knee support. On December 6, 2012, Joan Martin, Certified Nurse Practitioner noted in Plaintiff's chart that she attempted to follow-up on Dr. Hillis' referral. This is about 70 days

5

after the referral was made. [Doc. 68 at 3 and 66-2].  On January 12, 2013, Nurse Martin ordered Ibuprofen and on February 6, 2013, she ordered another knee brace, switched Mr. Apodaca's medication from Ibuprofen to Tylenol, and ordered prescriptions for Carafate in Prilosec (for gastrointestinal conditions).

It is undisputed that Mr. Apodaca never saw an orthopedist, nor was he referred for surgery while at the Curry County Detention Center.  Mr. Apodaca was released on February 14, 2014 (to AAA Bail bonds). He was again arrested on booked on a probation violation on April 15, 2013. Below is a brief time line of Mr. Apodaca's treatment at Curry County Detention Center which I prepared to memorialize Mr. Apodaca's treatment from the medical records that Mr. Hart provided to me.

| **Date:** | **Event:** |
| --- | --- |
| 9/7/12 | Mr. Apodaca is arrested and is at the Curry County Detention Center as of 2:50 pm. |
| 9/8/12 | Dr. Hillis orders X rays of Mr. Apodaca's right knee as Mr. Apodaca is unable to bear weight on it. |
| 9/11/12 | CHS provider Summer Southern (LPN) examines Mr. Apodaca where she notes swelling and bruising but Mr. Apodaca would not let Nurse Southern touch area to feel for any abnormalities. Nurse Southern calls the doctor and Dr. says to immobilize knee and give 800 mg of Ibuprofen. Mr. Apodaca eventually allows LPN Southern to palpate the area where she notes "slight rubbing on outside of knee." |
| 9/14/12 | Dr. Hillis examines Mr. Apodaca and notes that Mr. Apodaca is unable to bend and  or straighten the leg; "right knee popped when rolled over."   Dr. Hillis refers Mr. Apodaca for an MRI.  The note says "patient very resistant to exam." |
| 9/24/12 | Mr. Apodaca undergoes an MRI which shows a torn ACL and torn horn. |
| 9/27/12 | Dr. Hillis referred Plaintiff to an orthopedist for consult/referral to orthopedics for possible surgery of right knee. |
| 10/1/12 | Dr. Hillis[4] purportedly examines Mr. Apodaca where the note reads "patient  has had DOI (unreadable)  denied sports exempt track --- 100 yard dash." Took Ibuprofen, took swelling." |

---

[4] Per counsel, Dr. Hillis is unable to be deposed. He apparently has been diagnosed with Alzheimer's

| Date | Entry |
|---|---|
| 10/5/12 | Dr. Hillis ordered Lortab 5/325mg |
| 10/12/12 | Raymond Herr, chief medical officer, gives authorization for an orthopedics consult if Mr. Apodaca was to be at the facility more than 90 days |
| 10/9/12 | Note reads: "seen in medical  Ibuprofen 200 mg. PO BID 90 days, for Right knee injury." |
| 10/10/12 | The note says "seen in medical." But there is no other documentation. |
| 10/16/12 | Dr. Hillis orders an elastic knee support. |
| 11/8/12 | Mr. Apodaca asks for his films. He is told they do not have films or discs on file. |
| 11/13/12 | CHS notes reflect that there are four dockets open. Last pre-trial January 2012. Mr. Apodaca "will be there awhile." But notes referral to Plains Regional Dr. Cisco is authorized. |
| 12/5/12 | Examined by Nurse Martin where the note says "right knee pain + MRI, Patient admitted injury was pre-existing to being placed in jail." Nurse Martin suggests a knee brace, continue with Ibuprofen and "will discuss case with Dr. Herr about ortho referral." |
| 12/6/12 | Nurse Martin left message for Dr. Herr as of 12/7/12 no return call. |
| 12/8/12 | Document that Mr. Apodaca refused medical services. |
| 12/21/12 | Mr. Apodaca is given a knee brace. |
| 12/31/12 | Mr. Apodaca writes "I aint having any type of progress with this knee brace. It's just cutting off my circulation and making my knee hurt worse. When I try walking, my leg goes numb from the bottom of my heel till the middle of my thigh and tingles and after 7 or 8 steps my leg and knee can give out. |
| 1/10/13 | Mr. Apodaca asks for another MRI and asks about referral |
| 1/12/13 | Nurse Martin ordered Ibuprofen 200 mg BID |
| 1/22/13 | Mr. Apodaca is "seen in medical." |
| 2/6/13 | Nurse Martin notes that Mr. Apodaca's knee is very stiff; changed medication from Ibuprofen to Tylenol and there is an order for a knee brace, Tylenol, Prilosec, and Carafate (used to treat GI reflux).  Mr. Apodaca was denied an X Ray on his stomach and note says provider reviewed chart. |

disease and is currently residing in a long-term care facility per Nurse Martin's affidavit as well.

2/14/13        Mr. Apodaca is released from the Curry County Detention Center.

### IV.    Issues Bearing on Recovery:

When reviewing a proposed settlement, the Court considers the following four issues: (1) whether the terms of the settlement were fairly and honestly negotiated; (2) whether serious questions of law or disputes of fact exist, placing the ultimate outcome of litigation in doubt; (3) whether the value of an immediate and swift recovery outweighs the mere possibility of greater future relief; and finally, (4) whether the settlement is fair and reasonable in its effect.  See *Jones v. Nuclear Pharmacy, Inc*. 741 F.2d 322 (10th Cir. 1984).  Given the facts of this case, coupled with the current law regarding 14th Amendment claims, I believe each of these factors weighs in favor of the Court approving this settlement in the amount of $15,000.00 as being fair, reasonable, and in the best interest of Victor Apodaca.

### A.    Whether the terms of the settlement were fairly and honestly negotiated.

The parties participated in two settlement conferences without reaching an agreement. I have reviewed some of the correspondence leading up to the settlement conference and the offers exchanged.  I have also communicated with counsel and spoken to Victor Apodaca about the settlement processes.  Based on my review, I do believe that there was any collusive or improper negotiation.  In my discussions with Mr. Apodaca, I asked him if was aware that he could proceed to trial, where a jury could have awarded him more money or less money or no money at all if this matter were to proceed. He indicated he understood this and wished to settle his case. He also stated that he understood that he was giving up his right to trial by jury and no one had forced him to do so. Thus, based on the foregoing, I believe this case was fairly and honestly negotiated and it is my belief that this first factor under the *Jones* case, is satisfied by this settlement.  *Jones v. Nuclear Pharmacy, Inc.* 741 F.2d 322 (10th Cir. 1984).

**B.  Whether serious questions of law or disputes of fact exist, placing the ultimate outcome of litigation in doubt.**

The second *Jones* factor also bodes in favor of settlement in this case. Here, there are several serious questions of both law and disputes of fact which place the ultimate outcome of this litigation in doubt.  In addition to factual disputes described above, (i.e. how Mr. Apodaca was injured; how long he was to be at Curry County), there are also serious questions of law which make the ultimate disposition of this case in doubt as there are significant issues related to liability, causation, and damages in this case.  This is because a jury could believe that Mr. Apodaca was afforded constitutionally adequate medical care during his incarceration. Thus, again, this is a question of fact as to whether Dr. Hillis specifically or Nurse Lueras (the only remaining Defendants), denied or delayed Mr. Apodaca such care as to make them liable under the 8th Amendment considering Mr. Apodaca *was* in fact being treated as described above. Moreover, a mere delay in medical treatment does not constitute a constitutional violation unless it can be shown that the delay was the result of deliberate indifference and resulted in substantial harm, such as lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d at 950; *See also See Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993).

The Supreme Court first recognized claims for deliberate indifference to a prisoner's medical needs in *Estelle v. Gamble*, 429 U.S. 97 (1976). There, the Court held that prison officials violate the Eighth Amendment's ban on cruel and unusual punishment[1] if their "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Id.* at 104 (internal citation and quotation marks omitted). Merely "inadvertent failure to provide adequate medical care" is not enough, nor does "a complaint that a physician has been negligent in diagnosing or treating a medical condition… state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 105.  Medical malpractice does not become a constitutional violation merely

because the victim is a prisoner. Instead, in order to state a cognizable claim, "a prisoner must allege acts or omissions sufficiently harmful to evince deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" that there is a violation of the Eighth Amendment. *Id.* at 105-106.

The Supreme Court clarified the standards applicable to deliberate indifference claims in *Farmer v. Brennan*, 511 U.S. 825 (1994). The Court set out a two-pronged inquiry comprised of an objective and a subjective component. Under the objective inquiry, the alleged deprivation must be "sufficiently serious" to constitute a deprivation of constitutional dimension, e.g., a deprivation of medical care so egregious it is equivalent to cruel and unusual punishment. *Id.* at 834. Under the subjective inquiry, the prison official is required to have a "sufficiently culpable state of mind." *Id.* In describing the subjective inquiry, the Court made clear a prison official could not be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he[or she] must also draw the inference." *Id.* at 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact. *Id.* at 842. A doctor is not deliberately indifferent when he or she merely decides "whether additional diagnostic techniques or forms of treatment" are indicated. *Self v. Crum,* 439 F.3d 1227, 1232 (10th Cir. 2006)) *citing Estelle,* 429 U.S. at 107. The "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir.1999). Stating a claim for deliberate indifference requires showing "actual knowledge of the specific risk of harm to the detainee ... or that the risk was so substantial or pervasive that knowledge can be inferred." *Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994). In *Mata v. Saiz*, the Tenth Circuit counseled that the subjective component presents a high

evidentiary hurdle to a plaintiff: A prison official must know about, and must disregard, a substantial risk of serious harm to the plaintiff. *Mata*, 427 F.3d 745, 752 (10th Cir. 2005).

Plaintiff's claims are essentially that he did not get to see an orthopedic doctor. This is subject to dismissal under *Estelle,* as described above, 429 U.S. at 105, and its progeny as it is not guaranteed that this would meet the "deliberately indifferent" standard and instead, may or may not merely constitute negligence, for which Mr. Apodaca may not prevail. (A plaintiff's disagreement with a healthcare provider's diagnosis **and treatment** does not state a claim for deliberate indifference. *Id.* Here, it is not clear that Mr. Apodaca could meet either the objective or the subjective components necessary for this claim. First, notwithstanding the fact that Dr. Hillis *did* refer Mr. Apodaca to an orthopedist, it is not clear if the four month delay in Mr. Apodaca seeing an orthopedist (before he was released in February), is "sufficiently serious" to constitute the equivalent to cruel and unusual punishment. This is because it is not clear how this delay may or may not have *caused* additional harm. Mr. Apodaca's ACL was completely torn per the MRI so it is not clear that any delay could have caused it to become more damaged.

With regard to the subjective component, there is not any evidence that Dr. Hillis had a "sufficiently culpable state of mind." *Id.* These issues of fact make the ultimate disposition of this litigation in doubt. Moreover, in this case, Dr. Hillis did recommend that Mr. Apodaca undergo an orthopedic consult anyway. With regard to the delay in treatment, this may be at best, a question of fact, but as described above, there is some evidence to the contrary. Further, it is undisputed that Mr. Apodaca was offered medical care as described above. Mr. Apodaca was seen by CHS staff throughout his incarceration. He was also discharged about five months after his initial arrest and incarceration (on September 7, 2012) on February 14, 2013, and about four months after the results of the MRI on September 24, 2012. Yet after his discharge, Mr. Apodaca did not see an orthopedic doctor when he was released in February 2013. Again, it is

11

not guaranteed that the deliberate indifference standard could be met under these facts and if it is not met, Mr. Apodaca's claims could be dismissed and he would receive nothing.

In addition to the issue of whether these defendants were "deliberately indifferent" the Court did not forego Defendants' ability to file another motion to dismiss based on qualified immunity[5] at another time although the Court determined that "the allegations and evidence regarding the circumstances of Defendants' employment are not adequate to analyze whether they, as privately employed medical care providers, might be entitled to raise the defense of qualified immunity." **[Doc 68 p.10].**

**Causation:**

Next, in addition to these liability issues, there are certainly issues about causation. This is because it is not clear how the Defendant's alleged failure to ensure that Mr. Apodaca saw an orthopedic doctor, damaged Mr. Apodaca. That is, with a torn ACL and horn, Mr. Apodaca may or may not have needed surgery, but it is not clear how the delay in Mr. Apodaca seeing an orthopedic doctor, further damaged him. He still may or may not have needed the surgery to fix his knee (even if he timely saw an orthopedist) and thus this may not have been the *cause* of any damage. And more importantly, again, when Mr. Apodaca did get released from Curry County, he did not seek medical care with an orthopedist anyway.

> "Section 1983 only imposes liability on a defendant who 'subjects, or causes to be subjected, any citizen…or other person…to the deprivation of any rights' under federal law. This provision has been read to require §1983 plaintiff to prove that the defendant's conduct was **the 'proximate cause' of Plaintiff's injuries**. See *Brower v. Cnty. Of Inyo*, 489 U.S. 593, 599 (1989) (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)); see also 1A Martin A. Schwartz et al., Section 1983 Litigation: Claims and Defenses §6.03[A] (Aspen 2011). 'Most courts have found that proximate cause under §1983

---

[5] Qualified immunity protects government officials from individual liability under § 1983 unless their conduct "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant raises qualified immunity, the plaintiff must show that (1) the defendant's actions violated a constitutional or statutory right and (2) the right violated was clearly established at the time. The court may consider either prong of the qualified immunity test first. *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013); *See also Pearson v. Callahan*, 555 U.S. 223, 236 (2009)

incorporates common-law tort causation principles.' Schwartz, supra at §6.03[A]; id.. n.37 (citing cases).

In this case, the claim for failure to ensure a referral was effectuated and how that *caused* Mr. Apodaca to suffer additional damages, would be difficult to prove. Plaintiff would need to find and hire an expert who would opine the delay in obtaining an orthopedic consult, caused permanent damage to Mr. Apodaca.

Based on these issues, it is my opinion that there are serious questions of law and disputes of fact exist, which place the ultimate outcome of litigation in doubt and accordingly, the second *Jones* factor also bodes in favor of settlement. Given the risks of trial, the potential benefits Mr. Apodaca *may* achieve from litigation, seems to have been obtained via settlement.

### C. Whether the value of an immediate and swift recovery outweighs the mere possibility of greater future relief.

The original Complaint in this case was filed on February 4, 2013, the Supplemental Complaint filed on February 8, 2013, and Amended/Supplemental Complaint adding New Mexico State police Department filed on May 13, 2013. Thus, this case has been pending for over five years. Based on the serious questions of law and disputes of fact, Plaintiff's claim may have been dismissed as described above. Further, Plaintiff would have to obtain expert testimony which would have resulted in the obligatory Motion to Strike Plaintiff's expert which could have been yet another basis for an appeal which would have prolonged this litigation. This proposed settlement eliminates the significant uncertainty of litigation as described above and provides an immediate and relatively swift recovery for Mr. Apodaca. Moreover, this settlement may provide some closure to Mr. Apodaca. Here, a factor that must be considered is Mr. Apodaca's recent convictions. Per a review of the Texas Department of Criminal Justice

Offender Information, Mr. Apodaca's release date is not until September 15, 2075 (57 years) He is eligible for parole on September 14, 2045.

**Offense History:**

| Offense Date | Offense | Sentence Date | County | Case No. | Sentence (YY-MM-DD) |
|---|---|---|---|---|---|
| 2015-09-13 | AGG ASLT PUB SERV | 2017-06-29 | CARSON | 6021 | 60-00-00 |
| 2015-09-13 | AGG ASLT PUB SERV | 2017-06-29 | CARSON | 6021 | 60-00-00 |
| 2015-09-13 | EVADE ARREST/MTR VEH | 2017-06-29 | CARSON | 6021 | 20-00-00 |
| 2015-09-13 | TERRORISTIC THREAT | 2017-06-29 | CARSON | 6021 | 20-00-00 |

As described above, if the matter were to proceed, it is not certain that Mr. Apodaca would be awarded any more than the $15,000.00 as a jury certainly may not believe that it is appropriate for a prisoner to obtain compensation when fleeing police. In addition, it is likely that Mr. Apodaca's costs would increase and since the awarding of expert witness fees is not allowed even if he were to prevail, there is little benefit to proceeding and hoping to recoup costs. (See 28 U.S.C.§1920 and D.N.M.L.R.-Civ. 54; expert fees are not allowed as taxable costs unless the Court appoints experts under Fed. R. Evid. 706; *Sipp v. UNUM Provident Corp*. et. al., No. CIV 01-1418 LFG/DJS, slip op. at 3 (D.N.M. Nov. 25, 2002)). Finally, counsel is not charging any attorney's fees. While counsel could have been awarded attorney's fees, it is not clear that counsel could have agreed to waive his attorneys' fees given the increased time associated with trial and litigation. Thus, it is my belief that the value of an immediate and relatively swift recovery certainly outweighs the mere possibility of greater future relief as required by the third *Jones* factor in this case.

    D.    **Whether the settlement is fair and reasonable in its effect.**

The amount of the proposed settlement for Victor Apodaca is for $15,00.00. The proposed distribution is as follows:

    Total Proposed Settlement:                      $15,000.00

14

|  | *Less* |  |
|---|---|---|
|  | • Attorneys' Fees: | $0 |
|  | • Gross Receipts Tax: | $0 |
| Total Attorneys' Fees and Tax: |  | $0 |
| Subtotal for Victor Apodaca: |  | $15,000.00 |

This money will be deposited in Mr. Apodaca's prisoner account.

**VII.   Recommendations:**

    It is my belief that the terms of the settlement are fair and should be approved by the Court.

    Respectfully submitted,
**YOUTZ & VALDEZ, P.C.**

*/s/ Gabrielle M. Valdez*
Gabrielle M. Valdez
*Guardian Ad Litem for Victor Apodaca*
900 Gold Ave. S.W.
Albuquerque, NM  87102
(505) 244-1200  (505) 244-9700 Fax
Gabrielle@youtzvaldez.com

    I HEREBY CERTIFY that on the  23rd day of  February 2018, I filed the foregoing using CM/ECF which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

MARTINEZ, HART, THOMPSON & SANCHEZ, P.C.
F. Michael Hart
1801 Rio Grande Blvd. NW
Albuquerque, NM 87104
(505) 343-1776 (505) 344-7709 facsimile
mikeh@osolawfirm.com
*Attorneys for Plaintiff*

PARK & ASSOCIATES, LLC
Alfred A. Park.
6100 Uptown Blvd., Suite 350
Albuquerque, NM 87110
 (505) 246-2805   (505) 246-2806 facsimile
apark@parklawnm.com
*Attorneys for Defendants*

*/s/ Gabrielle M. Valdez*
Gabrielle M. Valdez